IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 29, 2020

## STATE OF TENNESSEE v. EDWARD WAYNE SHUMACKER ALIAS JEFF WAYNE WITT

**Appeal from the Criminal Court for Hamilton County**
**No. 303951   Don W. Poole, Judge**

_____

### No. E2019-01297-CCA-R3-CD

_____

The Appellant, Edward Wayne Shumacker, was convicted in the Hamilton County Criminal Court of driving under the influence (DUI), DUI per se, driving on a revoked license, violating the seatbelt law, violating the financial responsibility law, and violating the vehicle registration law, all misdemeanors. After the jury found the Appellant guilty, he stipulated that he had five prior convictions of DUI and two prior convictions of driving on a revoked license. The trial court sentenced the Appellant as a Range III, persistent offender to twelve years for each conviction of sixth offense DUI, Class C felonies; merged the convictions; and ordered that the Appellant serve the twelve-year sentence concurrently with his misdemeanor sentences. On appeal, the Appellant contends that the trial court erred by denying his motion for additional discovery, that the trial court erred by denying his motion to exclude references to other bad acts, that the trial court erred by overruling his objection to the admissibility of expert testimony, and that his twelve-year sentence for DUI is excessive. Based upon the record and the parties' briefs, we conclude that there is no reversible error and affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Melody Farah Shekari (on appeal, at motion for new trial, at sentencing) and Mike A. Little, Tori Smith, Brandy Spurgin-Floyd, and Emily Brenyas (at trial), Chattanooga, Tennessee, for the appellant, Edward Wayne Shumacker.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Neal Pinkston, District Attorney General; and Kate Lavery, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

In January 2018, the Hamilton County Grand Jury indicted the Appellant for DUI, eleventh offense; DUI per se, eleventh offense; driving on a revoked license, second or subsequent conviction; violating the seatbelt law; violating the financial responsibility law; and violating the vehicle registration law. The Appellant went to trial in November 2018.

At trial, Calvin K. Naipo, a trooper for the Tennessee Highway Patrol (THP), testified that about 11:00 a.m. on November 24, 2017, which was the day after Thanksgiving, he saw the Appellant driving without wearing a seatbelt. Trooper Naipo said he knew the Appellant's seatbelt was not fastened because he "could see the shiny buckle" above the Appellant's shoulder as the Appellant passed by him on Lee Highway. Trooper Naipo began following the Appellant, verified he was not wearing a seatbelt, and noticed he did not have a license plate on his car. Trooper Naipo initiated a traffic stop, and the Appellant pulled over.

Trooper Naipo testified that another car had been following the Appellant. Trooper Naipo told that vehicle's driver, who was a woman, to pull in front of the Appellant, and Trooper Naipo approached the driver's window of the Appellant's car. He said that the Appellant "had bloodshot watery eyes," smelled of alcohol, and had an injury on his face. Trooper Naipo asked the Appellant about the injury, and the Appellant said he had been in a motorcycle accident recently.

Trooper Naipo testified that he asked for the Appellant's identification. The Appellant claimed he did not have physical identification on his person but gave Trooper Naipo a name, date of birth, and social security number. Trooper Naipo went to his police vehicle, contacted THP dispatch, and asked dispatch to check the Appellant's identification "through NCIC." Dispatch could not find any information for the Appellant, so Trooper Naipo returned to the Appellant and verified the Appellant's identification. Trooper Naipo went back to his patrol vehicle and had dispatch check the Appellant's identification a second time. Again, dispatch could not find any information for the Appellant. Trooper Naipo returned to the Appellant's car and asked the Appellant for his identification again. Trooper Naipo "wrote it down at this time" and showed the written identification to the Appellant. The Appellant verified that the spelling of his name and that his date of birth were correct. Trooper Naipo gave the identification to dispatch a third time, but dispatch still could not find any information for the Appellant.

Trooper Naipo testified that he approached the driver of the second vehicle and that he asked her for the Appellant's correct name and date of birth. Trooper Naipo gave the

information she provided to dispatch and "got a hit" on the Appellant. Trooper Naipo learned that the Appellant's driver's license had been revoked and that his car was not properly registered. The Appellant also did not provide Trooper Naipo with proof of insurance. At some point, Trooper Naipo learned the Appellant did have physical identification on his person.

Trooper Naipo testified that he had the Appellant perform field sobriety tests and that he arrested the Appellant for DUI because the Appellant gave him "enough clues" to conclude the Appellant was impaired. The State played a video recording of the stop, including the Appellant's field sobriety tests, for the jury.

Trooper Naipo testified that he transported the Appellant to jail and watched as a nurse drew the Appellant's blood at 1:20 p.m. The nurse gave the blood sample, in a sealed and labeled vial, to Trooper Naipo, and Trooper Naipo sent the sample to the Tennessee Bureau of Investigation (TBI) for analysis. Testing showed the Appellant's blood alcohol content (BAC) was 0.094 gram percent, which confirmed to Trooper Naipo that the Appellant was impaired.

On cross-examination, Trooper Naipo acknowledged that after seeing the Appellant not wearing a seatbelt, he initiated his blue lights and pulled in between the Appellant's car and the car that was following the Appellant. Trooper Naipo acknowledged that the Appellant pulled over immediately and that the Appellant "used his blinker." He also acknowledged that the Appellant was cooperative and that he did not ask the Appellant about alcohol until twenty minutes into the stop.

Sarah Douglas, a special agent forensic scientist for the TBI, testified as an expert in forensic toxicology that she analyzed the Appellant's blood sample. Agent Douglas generated an Official Alcohol Report, showing that the Appellant's BAC was 0.094 gram percent. She said the Appellant's BAC may have been higher when he was stopped than when his blood was drawn about two and one-half hours later. However, she also said his BAC may have been lower at the time of the stop than at the time of the blood draw. Agent Douglas never received a request for independent testing of the Appellant's blood sample.

On cross-examination, Agent Douglas testified that the TBI's standard procedure was to test a sample for alcohol twice and report the average of the two tests. In this case, one machine reported the Appellant's BAC as 0.0975 gram percent and another machine reported his BAC as 0.0915 gram percent. She said that the two results differed by only six thousandth gram percent, that she was confident the results were correct, and that the two results met the TBI's quality control criteria of being within five percent of the average.

Agent Douglas testified that in addition to ethanol, N-propanol, methanol, and acetone were found in the Appellant's blood sample. Regarding the N-propanol, Agent Douglas said that she had added N-propanol to the Appellant's blood sample to make sure the testing instrument was working correctly. Regarding the methanol and acetone, Agent Douglas did not think the methanol in the sample affected the Appellant's blood test, and the amount of acetone was so low that Agent Douglas questioned whether it was actually in the sample. Agent Douglas reiterated that the Appellant's BAC may have been less than 0.094 gram percent at the time of his traffic stop. On redirect examination, though, she said, "The most likely scenario is that he was higher or the same. But, again, in fairness, it is possible [that his BAC was lower than 0.094 gram percent]."

At the conclusion of Agent Douglas's testimony, the State rested its case. The Appellant did not present any proof, and the jury retired to deliberate. During deliberations, the State advised the trial court that although it had indicted the Appellant for DUI, eleventh offense, only five of those prior DUI offenses occurred within twenty years of the date of the instant violation and could be considered prior offenses. See Tenn. Code. Ann. § 55-10-405(a). The jury found the Appellant guilty as charged of DUI and DUI per se, Class A misdemeanors; driving on a revoked license, a Class A misdemeanor; violating the seatbelt law, a Class C misdemeanor; violating the financial responsibility law, a Class C misdemeanor; and violating the vehicle registration law, a Class C misdemeanor. The Appellant stipulated to having five prior convictions of DUI, which elevated his DUI convictions to Class C felonies, and two prior convictions of driving on a revoked license.

## II. Analysis

### A. Additional Discovery

The Appellant contends that the trial court abused its discretion by denying his motion for additional discovery in which he requested the TBI's scientific reports for his blood test. He claims that the reports were relevant and material to his defense and that the State's suppression of the reports violated Brady v. Maryland, 373 U.S. 83 (1963). The State argues that the trial court did not abuse its discretion because the Appellant failed to show the scientific reports were material to the preparation of his defense and because the Appellant failed to show the State intended to use the scientific reports in its case-in-chief. We agree with the State.

The record reflects that the Appellant filed a general discovery motion pursuant to Tennessee Rule of Criminal Procedure 16 before trial and that the trial court granted the motion. Subsequently, the Appellant filed a Motion for Discovery and Production of Discoverable Information, requesting that the State provide him with "the results and reports of the Tennessee Bureau of Investigation scientific tests, also referred to as

litigation packages and control run reports." The State responded, arguing that it was not required to turn over the requested information because the reports were work product, because the reports were not material to the Appellant's defense, and because the State intended to use only the Appellant's Official Alcohol Report in the State's case-in-chief. The State noted that the Appellant never requested independent testing of his blood sample.

The Appellant filed a response, contending that the scientific reports were admissible pursuant to Tennessee Rules of Criminal Procedure 16(a)(1)(F) or 16(a)(1)(G). The Appellant asserted that the scientific reports, which were produced by a machine, were not work product. The Appellant also asserted that because the Official Alcohol Report was a summary of the scientific reports, the State was going to use the scientific reports in its case-in-chief. The Appellant then specifically requested the following "material" documents:

"(1) A copy of the gas chromatography printout of the standards used at the beginning of the run, just prior to Defendant's sample, and the printout of the standards just subsequent to the Defendant's sample.
(2) Copies of the case notes, analytical data, standards, controls, and the gas chromatography printouts of all samples, which were analyzed prior to the Defendant's, as well as all samples analyzed after the Defendant's sample.
(3) Certificates of assay from an independent laboratory, not by the manufacturer, on all of the ethanol standards used in the analysis of the Defendant's blood.
(4) A detailed description of the type of water used in preparation of the alcohol standard, e.g., distilled, deionized or tap. This description should include any analysis performed on the water, including the identification of any screened minerals in the water.
(5) Sample worksheet for all samples analyzed on the day the Defendant's sample was tested.
(6) Raw data files from the defendant's blood sample."

The Appellant also listed eleven "common errors that occur with devices and testing at issue in the defendant's case." The Appellant noted that at the trial of Benjamin Brewer, "naphthalene was found in the TBI results from the gas chromatography test. TBI admitted on cross-examination it was a contaminated sample, and that they had contaminated other samples as well." The Appellant stated that he wanted the "underlying data" for his own test to determine whether his test also was contaminated.

At a hearing on whether the Appellant should receive the TBI's scientific reports, the trial court asked defense counsel how the reports were material, and defense counsel responded as follows:

One is for us to be able to prepare for cross-examination, to be able to challenge the testing. I think we're allowed to do that. And if we don't know what the underlying report that I argue that we're entitled to, we cannot -- we cannot let a -- well, first of all, we cannot develop our cross-examination questions or what our strategy would be in showing the Court if there are problems with this -- with the scientific -- I don't know if there are.

Judge, we're also allowed to have our -- this information reviewed by an expert for him to determine whether or not -- if he finds any problems with the testing. I can't do that at trial. I can't do that with doing a subsequent testing on our own.

What is at issue is the test that the State is going to introduce at trial and we have a right to challenge that evidence, but if we do not have the scientific testing that backs the official report we're not able to do that. That's why I think it's material.

. . . .

Now, I can get an example, Judge. . . . In [Mr Brewer's] case we were provided with all the documents, the scientific tests that backed up the official report. And in that report we had an expert to take a look at it. A pharmacologist looked at that report. And he -- we took the raw data files that were in that case, he plugged them into the same software, very similar to what TBI uses, and showed that there were problems with the results, how the -- in that case how the drug was interpreted. And it was -- we discovered through that process that there was naphthalene in the sample.

Now, when -- in that particular case that allowed us to cross-examine the TBI agent in that case.

. . . .

We cannot develop vigorous cross-examination regarding the TBI agent and the testing without seeing the scientific test reports, and I think that's why it's material.

The State argued that although the TBI's testing in Mr. Brewer's case showed the presence of naphthalene, the naphthalene "had no affect on the methamphetamine reading"; accordingly, Mr. Brewer's case did not show "any problem" with the TBI's

- 6 -

analysis and did not support the Appellant's claim that the TBI's scientific reports were material to his case. The State asserted that the presence of naphthalene in Mr. Brewer's case was "much ado about nothing" and that the Appellant wanted the scientific reports for his own blood test in order to go on a "fishing expedition." Defense counsel, who represented Mr. Brewer at trial, responded that he never would have learned about the presence of naphthalene from Mr. Brewer's testing if the defense had not received the TBI's scientific reports and that the Appellant "had a right to question the testing."

The State introduced a transcript of TBI Special Agent Melinda Quinn's testimony from Mr. Brewer's trial into evidence.[1] The State also called her to testify at the hearing. Agent Quinn testified as an expert in forensic toxicology that the TBI used gas chromatography and mass spectrometry to analyze blood samples and that two tests had to be "run" in order for a sample to be considered "positive" for a particular drug. Agent Quinn testified at Mr. Brewer's trial that methamphetamine was in his blood sample. She said that another substance had the same retention time as the methamphetamine but that the substance's "chemical fingerprint" was different. Agent Quinn thought the substance "probably" was naphthalene, but she "didn't run any naphthalene quality control." Regardless, the presence of naphthalene did not affect Mr. Brewer's test for methamphetamine. Agent Quinn stated that it was standard TBI procedure for a second scientist to review test results, that a second scientist reviewed her work in the Mr. Brewer's case, and that no errors were found.

Agent Quinn testified that she provided several hundred pages of documents to Mr. Brewer's defense and that the toxicology analysis encompassed at least one hundred pages.

---

[1] A brief explanation of the naphthalene issue in State v. Benjamin Scott Brewer, No. E2019-00355-CCA-R3-CD, 2020 WL 1672958, at *5 (Tenn. Crim. App. at Knoxville, Apr. 6, 2020), is in order. At Mr. Brewer's trial, Agent Quinn testified for the State as an expert in forensic toxicology that she analyzed Mr. Brewer's blood sample and that his blood contained .08 micrograms per milliliter of methamphetamine. On cross-examination by defense counsel, Agent Quinn testified that the solvent she used to analyze Mr. Brewer's blood for drugs "'was contaminated with naphthalene.'" Id. The naphthalene was not in Mr. Brewer's blood but caused a "'naphthalene peak'" on the printout from the chromatogram. Id. Agent Quinn said that she did not remember making any notes about the naphthalene in her report and that the naphthalene did not prevent the TBI from being able to detect drugs in Mr. Brewer's blood. Id. The State turned over the TBI's scientific reports for Mr. Brewer's blood test to the defense, and a defense expert in pharmacology reviewed the reports. The expert testified at trial that he informed the defense that Mr. Brewer's blood was contaminated with naphthalene. Id. at *6. The expert also testified that he did not think the TBI's test was reliable due to the contamination and that he did not think the results showed the presence of methamphetamine. Id. Nevertheless, the jury convicted Mr. Brewer as charged of various offenses, including six counts of vehicular homicide by intoxication and DUI. Id. On direct appeal of his convictions, Mr. Brewer argued that the State committed a Brady violation by failing to disclose to the defense before trial that his blood sample had been contaminated with naphthalene. Id. This court concluded that Mr. Brewer failed to show a Brady violation. Id. at *10.

- 7 -

She said that she photocopied the documents and sent them to Mr. Brewer and that doing so for every defendant would impact her ability to analyze samples.

On cross-examination, Agent Quinn acknowledged that defense counsel cross-examined her at Mr. Brewer's trial about the contaminated solvent. The TBI's documentation did not specifically mention the contaminated solvent; instead, Mr. Brewer's expert noticed the contaminated solvent in the documentation. She said that the "peak" on Mr. Brewer's chromatograph printout was "unusual" but not "wrong" and that she had never reported a test result that she later learned was inaccurate. She said that if she were asked by a defendant to conduct an expert review of the TBI's testing, she "would want to look at the quality control packet and the case sample." She said that she also "would need the software associated with it. There's lots of different software. I would want to start with the quality control packet and the actual case printouts." Agent Quinn said that each quality control packet contained at least seventy pages of documents, that she did not have an administrative assistant, and that she would have to print the pages herself. She acknowledged that she would not generate an Official Alcohol Report without also generating a scientific report.

Agent Douglas, an expert in forensic toxicology, also testified for the State at the hearing. Agent Douglas analyzed the Appellant's blood sample and issued an Official Alcohol Report. The State asked, "How many pages does a typical alcohol test such as Mr. Shumacker's generate?" Agent Douglas answered, "The case itself is only four pages; however, there [are] a lot of quality documents that are associated with that. It's approximately 140 for the batch." She said that she tested about ninety samples per week and that having to provide quality control packets to every defense attorney would amount to more than 10,000 pages of documentation per week.

On cross-examination, Agent Douglas testified that the Appellant's Official Alcohol Report was the final report she prepared for the Appellant's blood testing. She then identified four pages of data for the Appellant's blood test that were provided to the defense. She acknowledged that the four pages were the first set of scientific reports generated by the testing. Agent Douglas also acknowledged that defense counsel interviewed her on the telephone and that defense counsel was unable to continue his interview because he had only those four pages of the Appellant's test reports.

Agent Douglas testified that she used the gas chromatograph and mass spectrometer to analyze the Appellant's blood for alcohol, that she and another toxicologist reviewed the results, and that naphthalene was not an issue in this case. Defense counsel asked if Agent Douglas provided the district attorney's office with all of the testing information for DUI cases, and she said that she would if asked but that "I've never had a district attorney ask for my quality control packets." She said that she thought the results of the Appellant's

blood test were correct and that she did not think she had ever made a mistake in testing, explaining, "We have so many quality control policies that I feel like either I would catch it or my reviewer.  We go through our data very intensively before we issue a report and then that reviewer looks at the data intensively as well to make sure everything meets quality control criteria."  Agent Douglas stated that if a defendant asked her to conduct an expert review of the TBI's work, she would want to see the TBI's quality control documents as part of her review.

At the conclusion of the hearing, defense counsel advised the trial court that he wanted the requested discovery so that an expert could review it for "any issues."  In a written order, the trial court ruled that the Appellant was not entitled to the additional information, finding that he failed to show the TBI's scientific reports were material to the preparation of his defense.  The Appellant appeals the ruling of the trial court.

The Appellant maintains that the requested information was discoverable pursuant to Tennessee Rule of Criminal Procedure 16(a)(1)(F) or (G).  Tennessee Rule of Criminal Procedure 16(a)(1) provides:

> (F)  Documents and Objects.  Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the state, and:
>
> > (i)  the item is material to preparing the defense;
> >
> > (ii) the government intends to use the item in its case-in-chief at trial; or
> >
> > (iii)  the item was obtained from or belongs to the defendant.
>
> (G) Reports of Examinations and Tests.  Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments if:
>
> > (i) the item is within the state's possession, custody, or control;

(ii)  the district attorney general knows--or through due diligence could know--that the item exists; and

(iii)  the item is material to the preparing of the defense or the state intends to use the item in its case-in-chief at trial.

It is within a trial court's discretion to enter orders necessary to ensure compliance with Rule 16.  State v. Brown, 836 S.W.2d 530, 548 (Tenn. 1992).  Therefore, we will review the trial court's denial of the Appellant's request for additional discovery for an abuse of discretion.

The Appellant first contends that the requested materials could be considered documents and, therefore, were discoverable pursuant to Tennessee Rule of Criminal Procedure 16(a)(1)(F).  He claims that the documents were in the State's possession and discoverable pursuant to Rule 16(a)(1)(F)(i) because they were material to the preparation of his defense and discoverable pursuant to Rule 16(a)(1)(F)(ii) because the State intended to use the Official Alcohol Report, which was based on the documents, in its case-in-chief at trial.  The Appellant also contends that the requested discovery materials were reports of scientific tests and, therefore, discoverable pursuant to Tennessee Rule of Criminal Procedure 16(a)(1)(G) because the reports were within the State's possession, the district attorney general knew the reports existed, and the reports were material to preparing the preparation of his defense or the State intended to use them in its case-in-chief at trial.

Granted, the TBI reports were in the State's possession.  See State v. Goodman, 643 S.W.2d 375, 379 (Tenn. Crim. App. 1982) (providing that "[w]hen the state utilizes the facilities of the F.B.I. Laboratory for various scientific tests, the F.B.I. is an agent for the State of Tennessee, and reports in its possession are in the state's possession for the purposes of [Rule 16]").  Regarding materiality, this court has explained:

"'Materiality means more than that the evidence in question bears some abstract logical relationship to the issues in the case. . . . There must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.'" United States v. Buckley, 586 F.2d 498, 506 (5th Cir. 1978) (quoting United States v. Ross, 511 F.2d 757, 762-63 (5th Cir. 1975)); see also United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991); United States v. RMI Co., 599 F.2d 1183, 1188 (3d Cir. 1979); United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993); Moore's Federal Practice—Criminal § 616.05 (2002); Timothy M. Hall, Annotation, Books, Papers, and Documents Subject to Discovery by Defendant Under Rule 16 of Federal Rules of Criminal Procedure, 108 A.L.R. Fed. 380, 400 (1992).  This definition of

materiality is not restricted to exculpatory evidence because the discovery of inculpatory evidence may enable the defendant to "'alter the quantum of proof in his favor' in several ways:  by preparing a strategy to confront the damaging evidence at trial; by conducting an investigation to attempt to discredit that evidence; or by not presenting a defense which is undercut by such evidence." United States v. Marshall, 132 F.3d 63, 68 (D.C. Cir. 1998). In order to be material, the discoverable item must "significantly help[ ] in 'uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal.'" United States v. Gaddis, 877 F.2d 605, 611 (7th Cir. 1989) (quoting United States v. Felt, 491 F. Supp. 179, 186 (D.D.C. 1979)); Lloyd, 992 F.2d at 350 (relying upon Felt's definition of materiality).  This court has previously defined the phrase "material to the preparation of the defendant's defense" using this definition: a tangible object under Rule 16(a)(1)(C) is material "'if there is a strong indication that [the evidence] will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony or assisting impeachment and rebuttal.'" State v. Hershel Clark, No. 02C01-9112-CR-00273, [1993 WL 188052, at *6] (Tenn. Crim. App. [at Jackson,] June 2, 1993) (quoting Felt, 491 F. Supp. at 186).

State v. Thomas Dee Huskey, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *59 (Tenn. Crim. App. at Knoxville, June 28, 2002).

In order to make a showing of materiality,

the defendant "must do more than emphatically state he needed certain discovery.  He must show how the discoverable items were material to the preparation of his defense." Id. at *60.  The defendant should make an offer of proof or seek to have the documents entered into the record under seal in order to assist this Court in evaluating his claim of materiality.  See State v. Phillip Matthew Burgess, M2013-00252-CCA-R3-CD, 2014 WL 309644, at *7 (Tenn. Crim. App. [at Nashville,] Jan. 28, 2014) (citing State v. Schiefelbein, 230 S.W.3d 88, 148 (Tenn. Crim. App. 2007)), no perm. app. filed; State v. Elizabeth Gay Tindell, No. E2008-02635-CCA-R3-CD, 2010 WL 2516875, at *16 (Tenn. Crim. App. [at Knoxville,] June 22, 2010), perm. app. denied (Tenn. Nov. 17, 2010).  On appeal, the defendant "bears the burden of showing 'the degree to which the impediments to discovery hindered trial preparation and defense at trial.'" State v. Anthony D. Forster, M2002-0008-CCA-R3-CD, 2011 WL 1431980, at *14 (Tenn. Crim. App. [at Nashville,] Apr. 12, 2011) (quoting State v. Brown, 836 S.W.2d 557, 560 (Tenn. 1993)), perm. app. denied (Tenn. Aug. 24, 2011).

- 11 -

State v. Jordan Thomas Peters, No. E2014-02322-CCA-R3-CD, 2015 WL 6768615, at *6 (Tenn. Crim. App. at Knoxville, Nov. 5, 2015).

The Appellant's case is factually similar to State v. Zane Allen Davis, Jr. In that case, the defendant possessed his blood test results showing that his BAC was 0.23 percent but requested various additional information from the TBI such as the raw data from his blood testing, including handwritten notes; line graphs and tabulated data printed by the testing equipment; and "any other document generated as a result of the testing of Defendant's blood sample." State v. Zane Allen Davis, Jr., No. M2000-00737-CCA-R3-CD, 2000 WL 1879518 at *4 (Tenn. Crim. App. at Nashville, Dec. 28, 2000). The State responded that the defendant was not entitled to the additional discovery under Tennessee Rule of Criminal Procedure 16. Id. The defendant filed a motion to compel, and the trial court denied the motion. Id. In affirming the ruling of the trial court, this court explained as follows:

> Not only is the record of the hearing on Defendant's motion to compel and Defendant's brief devoid of any proof establishing that the requested information was material, the trial record is deficient in this regard as well. Namely, we do not have before us any proof concerning what Defendant's expert would specifically require in the way of pertinent facts nor what he would do with them if he had them. We similarly lack proof of what particular documents the TBI has in its possession that would be helpful and how the documents would assist Defendant's case. Neither has Defendant offered any proof such as incompetency concerning the TBI's lab personnel or historical proof of inaccuracies or unreliable results with respect to the lab's instruments or equipment. We further observe that counsel could have asked that the trial court perform an in camera examination of the requested documents. In sum, since the State did not present the information in issue as evidence during trial and Defendant did not offer any proof as described above, we find no evidence that the requested documents were material. Defendant is not entitled to relief on this issue.

Id. at *5.

The Appellant contends that he demonstrated the requested documents were material to the preparation of his defense because "the defense in this case listed not only the specific types of report and information that they were seeking but also the list of errors that had been recently or in literature discovered to be at issue with these tests in particular." However, the Appellant did not provide any authority for his list of common errors and did not present any expert testimony regarding such errors at the hearing. Instead, he relied on

- 12 -

Benjamin Brewer, in which a contaminated solvent was discovered during testing, to show that the documents from his own testing were material. Agent Quinn testified at Mr. Brewer's trial and at the Appellant's hearing, though, that the naphthalene in Mr. Brewer's blood sample was unusual but did not affect the presence of methamphetamine in Mr. Brewer's blood. Moreover, Agent Douglas, who analyzed the Appellant's blood sample, testified that naphthalene was not an issue in the Appellant's case. Defense counsel had an opportunity to question Agent Douglas about the Appellant's blood analysis at trial, and Agent Douglas testified about other substances found in the Appellant's blood sample. She said those substances did not affect the Appellant's ethanol result, and defense counsel's cross-examination of Agent Douglas did not reveal any problems or potential problems with her analysis. "[W]here . . . the movant simply hopes that a later expert evaluation might reveal some flaw . . . , the subpoena is 'nothing but a classic fishing expedition.'" Elizabeth Gay Tindell, No. E2008-02635-CCA-R3-CD, 2010 WL 2516875, at *16 (quoting Commonwealth v. House, 295 S.W.3d 825, 827 (Ky. 2009)).

We note that Agent Quinn and Agent Douglas testified that they would want to see the TBI's quality control documents if asked to conduct an expert review. However, they did not explain what they would have done with the documents or what the documents could have shown them, and the Appellant did not present any proof as to what information his own expert would have needed from the TBI or what the expert would have done with the information. The Appellant also did not ask that the trial court conduct an in-camera review of the requested discovery and did not include the exhibits from the discovery hearing, which included the four pages of testing reports he received before trial, in the appellate record. See Tenn. R. App. App. 24(a). Finally, he did not ask that the requested discovery be placed into the appellate record under seal, which "severely hamper[s]" our review. Phillip Matthew Burgess, No. M2013-00252-CCA-R3-CD, 2014 WL 309644, at *7. In sum, we conclude that the Appellant failed to show that the requested discovery was material to the preparation of his defense.

As to the Appellant's assertion that the State's use of the Official Alcohol Report in its case-in-chief equated to use of the scientific test reports, Agent Douglas testified that that no district attorney had ever asked her for her quality control packets. Therefore, we reject that argument as well.

Lastly, the Appellant claims that the State's suppression of the reports violated Brady v. Maryland, 373 U.S. 83 (1963). However, as noted by the State, the Appellant failed to raise this issue in the trial court and failed to raise it in his motion for new trial. Therefore, it has been waived. See State v. Patricia Adkisson, No. M2010-02501-CCA-R3-CD, 2012 WL 12931581, at *6 (Tenn. Crim. App. at Nashville, May 2, 2012) (Brady issue waived for failing to raise it in trial court); State v. Charles Madison Blackman, Jr.,

No. 01C01-9708-CC-00335, 1998 WL 761811, at *4 (Tenn. Crim. App. at Nashville, Oct. 30, 1998) (Brady issue waived for failing to raise it in motion for new trial).

## B. Prior Bad Acts

The Appellant contends that the trial court erred by allowing the State to present evidence about his giving Trooper Naipo incorrect identifying information because the evidence was inadmissible under Tennessee Rule of Evidence 404(b). The State argues that the evidence was admissible. We agree with the State.

Before trial, the Appellant filed a motion in limine to prohibit the State from introducing evidence at trial that the Appellant gave Trooper Naipo incorrect identifying information. In the motion, the Appellant requested a jury-out hearing pursuant to Tennessee Rule of Evidence 404(b) in order for the trial court to determine whether a material issue existed other than conduct conforming to a character trait and, if so, whether the probative value of the evidence was outweighed by the danger of unfair prejudice.

The trial court held a jury-out hearing prior to Trooper Naipo's trial testimony. During the hearing, the prosecutor advised the trial court that she did not intend "to characterize [the Appellant's behavior] in any particular way" and argued that the Appellant's giving Trooper Naipo incorrect identifying information was relevant to the Appellant's impairment.

Trooper Naipo testified at the hearing that after he stopped the Appellant, he approached the Appellant's car. The Appellant had bloodshot and watery eyes and smelled of alcohol. Trooper Naipo asked the Appellant for his identifying identification, and the Appellant told Trooper Naipo that his name was Edward Lee Shumacker. The Appellant also spelled his name for the officer. Trooper Naipo reported the name to dispatch, but dispatch could not find any information for the Appellant. Trooper Naipo verified the information with the Appellant, returned to his police vehicle, and "tried it again." However, dispatch still was unable to find any information for the Appellant. Trooper Naipo explained as follows:

> I went back for the third time and physically showed him, wrote down the name and he stated that it was the correct spelling, date of birth, social security number. I went back to my vehicle, ran it again and nothing came up. I then talked with the female subject that was actually following Mr. Shumacker and asked if she knew the subject and she said she did. She gave me a correct spelling of his name and the date of his birth.

- 14 -

Using the correct information, Trooper Naipo learned that the Appellant's driver's license had been revoked and that the Appellant's car was not property registered.

At the conclusion of Trooper Naipo's testimony, the State advised the trial court that it planned to have Trooper Naipo testify about the Appellant's giving him incorrect identifying information and planned to play the video of the stop "to understand that the trooper is telling the truth as well." The trial court found clear and convincing evidence that the Appellant gave Trooper Naipo an incorrect name and that the evidence was relevant "to give a complete story of the crime, because I think the jury would understand if somebody is stopped, that [to] complete the story you would be asked your name, registration, driver's license and so forth." Regarding prejudice, the trial court found that the evidence "really doesn't show propensity at all in regard to any of the crimes for which he is charged." Accordingly, the trial court ruled that the evidence was admissible.

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

- 15 -

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The trial court complied with the procedures of Rule 404(b), but we disagree with the trial court's determination that the evidence was necessary to complete the story. In State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000), our supreme court stated that "evidence offered to show contextual background need not be excluded simply for the reason that it involves evidence of prior acts." However, our supreme court went on to explain that

> when the state seeks to offer evidence of other crimes, wrongs, or acts that is relevant only to provide a contextual background for the case, the state must establish, and the trial court must find, that (1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice.

Gilliland, 22 S.W.3d at 272.

Evidence that the Appellant gave Trooper Naipo incorrect identifying information was not needed to avoid a chronological or conceptual void in the State's case and was not needed to avoid jury confusion. Therefore, the evidence was not needed for completion of the story. That said, the evidence was relevant to the Appellant's impairment for DUI. Trooper Naipo testified that he asked the Appellant three times for the Appellant's correct identifying information and that the Appellant gave him incorrect information each time. Trooper Naipo even wrote down the information for the Appellant, and the Appellant verified that he had spelled his name correctly for Trooper Naipo. We agree with the State that the jury could reasonably infer from the Appellant's repeatedly giving the officer a false name that the Appellant's judgment was impaired due to his intoxication, particularly when someone traveling with the Appellant could provide his correct name to the officer. We note that while the evidence suggested the Appellant was trying to deceive Trooper Naipo so that Trooper Naipo would not learn the Appellant had prior offenses for DUI, was driving on a revoked license, and was driving without proper vehicle registration, Trooper Naipo never claimed the Appellant lied to him or tried to deceive him. Moreover, the State advised the trial court during the Rule 404(b) hearing that it was not going to characterize the Appellant's behavior. We note that the Appellant has failed to include the closing arguments in the appellate record; therefore, we do not know if or how the State

- 16 -

addressed the issue in its arguments to the jury. Therefore, while such evidence may have been somewhat prejudicial, we conclude that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Thus, the evidence was not prohibited by Tennessee Rule of Evidence 404(b).

## C. Expert Testimony

The Appellant contends that the trial court erred by allowing Agent Douglas to testify about "BAC scenarios" because her testimony was confusing and outside of her area of expertise as a forensic toxicologist. The State argues that the trial court did not err. We agree with the State.

Agent Douglas testified that she had a Bachelor of Science degree in applied chemistry with a "special focus" in forensics and that she had a Master of Science degree in chemistry. For her master's thesis, she "collected waste water and tested it for opiate compounds." As a graduate assistant at Tennessee Tech, Agent Douglas taught forensic chemistry, quantitative analysis, and general chemistry and "helped teach" organic chemistry. Agent Douglas stated that she had been working as a forensic toxicologist at the TBI Crime Laboratory for more than two years and that she had tested about 4,500 samples for the presence of alcohol during that time. She stated that while she had been employed with the TBI, she had attended "special training" for a controlled drinking study at the Tennessee Law Enforcement Training Academy. During the study, Agent Douglas watched individuals drink alcohol and interacted with them to learn the effects of alcohol. Agent Douglas also attended a program on alcohol and highway safety testing at the University of Indiana. She explained that the program was "a week long study and they just give presentations on what different alcohol levels do, how people will show those signs or not . . . and also how to do calculations related to blood alcohol content." She stated that both of the studies, as well as journal articles she had read, had been the "biggest impactors" on her learning the effects of drugs on the human body. She said that she currently was not a member of any professional organizations but that she used to be a member of the American Chemical Society and the American Society for Biochemistry and Molecular Biology. The trial court allowed Agent Douglas to testify, without any objection from the Appellant, as an expert in forensic toxicology.

During Agent Douglas's testimony, the State asked her about the general effects of alcohol on "most people." Defense counsel objected, arguing that such testimony was outside her area of expertise. The trial court overruled the objection. The State asked Agent Douglas if a person with a BAC of 0.09 would be "staggering and falling down," and she said that "it would depend on the person" and whether the person was an "inexperience or infrequent drinker." The State noted that the Appellant's blood was not drawn until two hours and twenty minutes after his traffic stop and asked if Agent Douglas

knew the rate alcohol dissipated in a person's blood. Agent Douglas explained that when a person consumed alcohol, the person's BAC started to rise and peaked thirty to sixty minutes after the person stopped drinking. She said that "people generally come down at 0.01 to 0.02 gram percent per hour which is roughly a drink an hour." The State asked if she could estimate the Appellant's BAC at the time of the stop, and Agent Douglas offered three "scenarios." In the first scenario, she said that if the Appellant's BAC "peaked" at the time of the stop or before the stop, then his BAC may have been greater than 0.094 gram percent at the time of the stop. In the second scenario, she said that if the Appellant's BAC peaked midway between the stop and the blood draw, then his BAC would have been about 0.094 gram percent at the time of the stop. In the final scenario, she said that if the Appellant's BAC peaked after the blood draw, then his BAC may have been less than 0.094 gram percent at the time of the stop. The State asked Agent Douglas to estimate the Appellant's BAC under the first scenario, and she said that it would have been between 0.114 and 0.134 gram percent. On cross-examination, defense counsel asked, "So it's fully possible that he had a lower [BAC] than .094 at the time he was driving?" Agent Douglas answered, "Yes, again it is possible based on that [third] scenario I gave you earlier."

It is well-settled that "the allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987) (citing Murray v. State, 377 S.W.2d 918, 920 (1964); Bryant v. State, 539 S.W.2d 816, 819 (Tenn. Crim. App. 1976); State v. Holcomb, 643 S.W.2d 336, 341 (Tenn. Crim. App. 1982)). This court will not disturb the trial court's ruling absent a clear showing that the trial court abused its discretion in admitting or disallowing expert testimony. Id.; State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). Moreover, this court will not find an abuse of discretion unless it "'appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Stevens, 78 S.W.3d at 832 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

In this case, Agent Douglas testified as an expert in forensic toxicology. She said she had studied the effects of alcohol on the human body, and the State asked if she knew the alcohol dissipation rate in the human body. Agent Douglas said ethanol dissipated at a rate of 0.01 to 0.02 gram percent per hour. Given that the Appellant's blood was not drawn for almost two and one-half hours after his traffic stop, Agent Douglas then gave three scenarios in which the Appellant's BAC may have peaked at or near the time of his stop, peaked midway between his stop and his blood draw, and peaked after his blood draw. In our view, Agent Douglas's testimony was neither outside her area of expertise nor confusing to the jury. Therefore, we conclude that the trial court did not abuse its discretion.

## D. Excessive Sentence

The Appellant contends that his twelve-year sentences for DUI are excessive. Specifically, he asserts that the trial court should have mitigated his sentences because he had "a place to live, work, and family support"; because he was not a danger to other motorists at the time of his arrest, "as evidence by a lack of speeding ticket or allegations of swerving"; and because he was not on probation at the time of his arrest. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

At the Appellant's sentencing hearing, Michelina Rolston of the Tennessee Probation Office testified that she prepared the Appellant's presentence report. She acknowledged that her investigation for the Appellant's report was one of the "most extensive" investigations she had ever conducted. The Appellant had multiple prior offenses, which included twelve felonies and additional misdemeanors. The crimes spanned an extensive period of time. Ms. Rolston said that according to a risk assessment completed for the Appellant, he began using alcohol or drugs when he was between fourteen and seventeen years old. The assessment stated that the Appellant had never been "clean and sober" for six months or more.

On cross-examination, Ms. Rolston testified that the Appellant reported no gang affiliation but that the TOMIS system showed he was suspected of being in the Crazy White Boys Gang. The Appellant reported no current health problems, and Ms. Rolston did not remember him saying that he had surgery on his right leg or hip. The Appellant told Ms. Rolston that he had not received any substance abuse treatment, but the TOMIS system showed he was in a treatment program. Ms. Rolston acknowledged that the Appellant received a Strong-R assessment and that he was considered a moderate risk of reoffending.

The State introduced the Appellant's presentence report into evidence. In addition to Ms. Rolston's testimony, the report showed that the Appellant was fifty-three years old and single. According to the report, the Appellant dropped out of high school in the twelfth grade but obtained his GED. In the report, the Appellant described his physical health as good and said that he did not have any problems with drugs or alcohol. The Appellant said he may have had a drinking problem "when he was younger but that . . . his drinking habits [had] gotten better as he had gotten older." The Appellant stated that he had been self-employed as a builder for more than thirty years but that he did not have a business license and "worked under the table."

The Appellant's criminal history spanned eight pages of the report and showed that he began committing crimes in 1984 when he was eighteen years old. He continued to commit crimes at almost every age until 2012 when he was forty-seven years old. The report showed that the Appellant had approximately fifty convictions with eleven or twelve

of them being felonies. The Appellant's felony offenses included numerous DUI convictions, several convictions of felonious operation of a motor vehicle, a conviction of aggravated assault, and a conviction for a weapons offense. The Appellant's misdemeanor offenses included driving on a revoked license, driving without a license, simple assault, public intoxication, driving while impaired, criminal impersonation, evading arrest, reckless endangerment, speeding, violating the open container law, driving on the wrong side of the road, improper passing, escaping from a workhouse, failure to appear, shoplifting, malicious mischief, and reckless driving. From 1980 to 1983, the Appellant was adjudicated delinquent of prowling, carrying a dangerous weapon, and disorderly conduct.

Jonathan Johnson testified for the Appellant. Mr. Johnson testified that he was the court liaison for House of Refuge and was responsible for completing intake of new clients or potential clients. Mr. Johnson described House of Refuge as a twelve-month, faith-based program "where we help guys back into society, help them build a savings account, help them go to work, doing programming and going to church." He explained that the program had three residential houses in Chattanooga and that the houses were supervised twenty-four hours per day. Participants were required to work, and House of Refuge provided transportation for them. They also were subjected to random drug screens. Mr. Johnson met with the Appellant about the program prior to the Appellant's sentencing hearing, and they discussed how the program could help the Appellant. Mr. Johnson said that the Appellant "seemed like a good potential client," that the Appellant "seemed genuine about making some changes [in] his life," and that House of Refuge had a "spot" available for the Appellant.

On cross-examination, Mr. Johnson acknowledged that the Appellant was convicted of his first DUI in 1984. In 2002, the Appellant was sentenced to five years for another DUI. The Appellant's probation for that DUI was revoked, and he was ordered to serve his sentence in confinement. Mr. Johnson acknowledged that nothing indicated the Appellant had previously sought treatment at House of Refuge.

Brenda Mayhan, the Appellant's older sister, testified that the Appellant lived in a house owned by their family in East Brainerd and that the Appellant "keeps it up." The Appellant had been living in the house "[o]ff and on for years," and he and Ms. Mayhan grew up in the house. Ms. Mayhan said that she and the Appellant had "pretty rough" childhoods, that they were "subjected to the criminal element and alcohol was in [the] household," and that "all of us started drinking at eight or nine, something like that." Ms. Mayhan was in therapy for twelve years, which helped her, and she suggested substance abuse treatment to the Appellant several times. However, he would not get treatment because he was addicted to alcohol. Ms. Mayhan explained that their father was a teamster and an alcoholic and that their mother was a bail bondsman. She said that the family home

was still available to the Appellant, that she would support him if the trial court granted an alternative sentence, and that she could drive him to appointments.

On cross-examination, Ms. Mayhan acknowledged that she had tried to be a positive influence on the Appellant but said that she had watched him "[d]estroy himself." The State asked Ms. Mayhan if the Appellant hit their mother with a motorcycle helmet in 2008, and she answered as follows:

> Well, mother was pretty violent herself. She had hit him in the head with a piece of stove wood, he was trying to get away from her. She was coming after him with something. I mean that's just the way our family was, you know, highly abusive. So that's probably the only way he could get away from her. And she had bruises on her arms right here and it was fingerprints where he had tried to hold her off of him. My mother was an undiagnosed schizophrenic and her doctor told her so when she came down with Alzheimer's in 2010. So, you know, that's what we lived with.

The Appellant made an allocution in which he stated, "I have never assaulted my mother in my life, never the first time." He said that when Trooper Naipo pulled him over, he did everything Trooper Naipo asked. He said that he was not feeling the effects of alcohol but that Trooper Naipo smelled alcohol on him and arrested him. The Appellant said he had been in confinement for eighteen months and, therefore, had not consumed any alcohol during that time. He admitted that he was an alcoholic and said that he would be willing to comply with House of Refuge, house arrest, or any program in which he could receive treatment for his addiction. He said that he had been to prison twice for DUI convictions and that treatment would help him recover from his alcoholism and "probably would stop this problem with my driving." The Appellant promised the trial court that he would "never get another DUI." After the Appellant's allocution, defense counsel introduced the Appellant's mental health records from Silverdale Detention Facility into evidence, showing that the Appellant suffered from alcohol-induced mood disorder, anxiety, and major depressive disorder.

The prosecutor advised the trial court that she had never seen a prior criminal record as extensive as the Appellant's record and that "[f]rom 1981 to the present day, almost no gaps in criminal behavior." She also advised the trial court that the Appellant had "a number" of probation violations. The State requested that the trial court enhance the Appellant's sentences based on his history of criminal convictions and behavior, for his failure to comply with probation in previous cases, and for his driving on a busy highway in which Trooper Naipo's video showed that there was "a fair amount of traffic." Defense counsel stated that the Appellant had "a long criminal record" but that "the vast majority

- 21 -

of it is misdemeanors." Defense counsel requested that the trial court mitigate the Appellant's sentences because his criminal conduct did not cause serious bodily injury and because he had a mental condition for which he needed treatement. Defense counsel also requested that the trial court mitigate the Appellant's sentences under the "catchall" because the Appellant had a place to live and family support and because House of Refuge was willing to accept him. See Tenn. Code Ann. § 40-35-113(13). The Appellant requested that he serve his serve his sentences in community corrections.

The trial court applied enhancement factor (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," stating, "Sadly, Mr. Shumacker has an unbelievably bad criminal conviction record." Tenn. Code Ann. § 40-35-114(1). The trial court gave the factor "great weight." As requested by the State, the trial court also applied enhancement factors (8), that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community," and (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." Tenn. Code Ann. § 40-35-114(8), (10). The trial court found that the Appellant had been granted probation or partial suspension of his sentences seventeen times and that his probation had been revoked at least four times and gave great weight to enhancement factor (8). The trial court held that the Appellant was entitled to "some" mitigation under the catchall factor due to his "rough and tough childhood" and mental illness. See Tenn. Code Ann. § 40-35-113(13).

The trial court stated that the Appellant's potential for rehabilitation was "not great" due to his prior criminal history and failures on probation and noted that he was not eligible for probation because his DUI sentences were not ten years or less. See Tenn. Code Ann. § 40-35-303(a). The trial court found that confinement was necessary to protect society from a defendant who had a long history of criminal conduct, that confinement was necessary to avoid depreciating the seriousness of the offenses, and that measures less restrictive than confinement had been frequently or recently applied unsuccessfully to the Appellant.

The trial court sentenced the Appellant as a Range III, persistent offender to twelve years for each DUI conviction, a Class C felony, and merged the convictions. See Tenn. Code Ann. § 40-35-112(c)(3). The trial court sentenced the Appellant to eleven months, twenty-nine days for driving on a revoked license, third offense, a Class A misdemeanor; thirty days for violating the seatbelt law, a Class C misdemeanor; and thirty days for violating the vehicle registration law, a Class C misdemeanor. The trial court imposed a fifty-dollar fine for violating the financial responsibility law, a Class C misdemeanor. The trial court ordered that the Appellant serve all of the sentences concurrently for a total

effective sentence of twelve years and denied the Appellant's request for alternative sentencing.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); State v. Caudle, 388 S.W.3d 273, 79 (Tenn. 2012) (applying the standard to alternative sentencing). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so

long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The Appellant contends that the trial court abused its discretion by sentencing him to more than the minimum punishment in the range, ten years, because the trial court failed to consider in mitigation that he had a place to live and work, that he had family support, that he was not a danger to others at the time of his arrest, and that he was not on probation at the time of his arrest. The Appellant claims that he "needed structure and mental health treatment, not incarceration." However, the Appellant does not contest the trial court's application of three enhancement factors. Two of those factors were based on the Appellant's prior criminal history and his failures to comply with the terms of probation. The trial court gave those two factors great weight but enhanced the Appellant's sentence only two years above the minimum punishment in the range. The Appellant's abominable criminal history alone supports that enhancement.

To the extent the Appellant is arguing that the trial court should have sentenced him to community corrections, this court has previously held that "eligibility for probation is not required for consideration of community corrections under section (a)." State v. Johnson, 342 S.W.3d 520, 523 (Tenn. Crim. App. 2009). That said, an offender is not automatically entitled to community corrections upon meeting the minimum requirements for eligibility. State v. Ball, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998). When determining a defendant's suitability for alternative sentencing, courts should consider whether the following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), are applicable:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

The trial court found that all three of the sentencing considerations in Tennessee Code Annotated section 40-35-103(1) were applicable and that the Appellant had a poor potential for rehabilitation. The Appellant first committed DUI in 1984. Despite repeated convictions of DUI and various other offenses, he never sought treatment for his addiction. Accordingly, we agree with the trial court's assessment and conclude that it did not abuse its discretion by denying the Appellant's request for community corrections.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE